[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11207
_____

Agency No. MSHA-2014-0030


NATIONAL MINING ASSOCIATION,
NATIONAL STONE, SAND & GRAVEL ASSOCIATION,
et al.,

                                                        Petitioners,

versus


UNITED STEEL WORKERS,
UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION,

                                                        Intervenors,


U.S. DEPARTMENT OF LABOR,
MINE SAFETY AND HEALTH ADMINISTRATION,

                                                        Respondents.

_____

Petition for Review of a Decision of the
Federal Mine Safety and Health Administration
_____

(January 22, 2021)

Before WILSON, LAGOA, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

Petitioners National Mining Association, National Stone, Sand & Gravel Association, Portland Cement Association, American Iron & Steel Institute, Georgia Mining Association, and Georgia Construction Aggregate Association (collectively, "petitioners") have filed a petition for review of Respondents United States Secretary of Labor and Mine Safety and Health Administration's ("MSHA" or the "Agency") final rule entitled "Examinations of Working Places in Metal and Nonmetal Mines" (the "Final Rule"). 82 Fed. Reg. 7680-95 (Jan. 23, 2017) (to be codified in 30 C.F.R. pts. 56 & 57). Petitioners raise a number of challenges to the Final Rule under the Administrative Procedure Act (5 U.S.C. § 551 et seq.) and the Constitution. After careful review, we deny the petition for review.

## I.    BACKGROUND

The Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (the "Mine Act"), regulates the nation's metal and nonmetal mines and promotes miner health and safety. The Act directs the Secretary of Labor to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." 30 U.S.C. § 811(a). The Secretary administers the Act through MSHA.

2

In 1969, MSHA's predecessor agency, the Mining Enforcement and Safety Administration, promulgated advisory standards pursuant to the Mine Act's predecessor statutes, the Federal Coal Mine Health and Safety Act of 1969 and the Federal Metal and Nonmetallic Mine Safety Act of 1966. The Mine Act gave the Secretary the option to either revoke or make mandatory the then-existing advisory standards. 30 U.S.C. § 961(b). MSHA made the standards mandatory. Until the Final Rule was promulgated, those standards' language had remained unchanged since 1979.

The relevant 1979 standards required that:

- a competent person designated by a mine's operator examine each working place at least once each shift for conditions that may adversely affect safety or health;

- the mine operator promptly initiate appropriate action to correct such conditions; and

- the operator keep records of such examinations for one year and make them available for review by the Secretary or his authorized representative.

30 C.F.R. §§ 56.18002, 57.18002.[1]

---

[1] Section 56 applies to surface metal and nonmetal mines, while Section 57 applies to underground metal and nonmetal mines.

3

In June 2016, MSHA published a proposal to revise the above standards. 82 Fed. Reg. at 7681. After six months, during which MSHA held four public hearings and received 73 written comments, MSHA promulgated the Final Rule. The Final Rule requires that:

- an examination of working places be conducted at least once per shift <u>before</u> miners begin work in an area (the "examination requirement");

- the operator promptly <u>notify</u> miners in any affected areas of any conditions found that may adversely affect their safety and health and promptly initiate appropriate action to correct such conditions (the "notification requirement"); and

- a record of the examination be made before the end of the shift that includes the examiners' name, date of examination, areas examined, conditions found that may adversely affect miners' health and safety, and date of corrective action taken (the "recording requirement").

82 Fed. Reg. at 7695.

The Final Rule plainly enhances mine operators' obligations with an aim toward augmenting miner safety. The 1979 standard required one examination of each working place per shift; the more stringent Final Rule requires that the examination occur before each shift. The 1979 standard required prompt corrective action; the Final Rule requires that mine operators notify miners of any

4

adverse conditions as well.  And the 1979 standard required records of mine examinations; the Final Rule requires more thorough records.[2]

The petitioners are various non-profit mining trade associations.  They timely filed a petition for review of the Final Rule in this Court under 30 U.S.C. § 811(d), which vests jurisdiction over a challenge to mandatory health or safety standards promulgated by MSHA in the United States Court of Appeals for the District of Columbia Circuit or the circuit where the petitioner resides or has its principal place of business.  Petitioners raised a number of challenges to the Final Rule under the Administrative Procedure Act, principally contending (1) that it was not issued in accordance with applicable law because MSHA failed to make the necessary finding of significant risk that would be eliminated or lessened by the

---

[2]     The Final Rule had an initial effective date of May 23, 2017.  MSHA twice delayed implementation of the Rule, see Examinations of Working Places in Metal and Nonmetal Mines, 82 Fed. Reg. 15,173 (Mar. 27, 2017); Examinations of Working Places in Metal and Nonmetal Mines, 82 Fed. Reg. 23,139 (May 22, 2017), and, after three days of effectiveness in October 2017, withdrew the new standards and delayed the effective date yet again, see Examinations of Working Places in Metal and Nonmetal Mines, 82 Fed. Reg. 46,411 (Oct. 5, 2017).

In April 2018, while petition for review in this case was pending, MSHA initiated a new rulemaking and amended the Final Rule.  83 Fed. Reg. 15,055 (April 9, 2018) (codified at 30 C.F.R. §§ 56.18002(a)-(c), 57.18002(a)-(c)).  The 2018 Amendment walked back the examination requirement, which required a competent person to examine each working place "at least once each shift before work begins or as miners begin work in that place."  83 Fed. Reg. at 15,057.  It also modified the recording requirement to only require records of adverse conditions that have not been corrected promptly.  Id.  The D.C. Circuit struck down this amended rule under the Mine Act's "no-less-protection" standard, which requires that "[n]o mandatory health or safety standard . . . shall reduce the protection afforded miners by an existing mandatory health or safety standard."  See United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019); 30 U.S.C. § 811(a)(9).  The amended rule having been struck down, the D.C. Circuit reinstated the Final Rule, thus clearing the way for petitioners' petition for review of the Final Rule in this Court.

Final Rule; (2) that MSHA failed to demonstrate that the Final Rule constituted an improvement over the preexisting standards; and (3) that the Final Rule was arbitrary and capricious.  5 U.S.C. § 706(2)(A), (C).  We address these arguments in turn in Parts II, III and IV, and then address in Part V several other arguments of petitioners.[3]

## II.  PETITIONERS' ARGUMENT THAT THE MINE ACT, LIKE THE OSH ACT, REQUIRES A THRESHOLD FINDING OF SIGNIFICANT RISK OF INJURIES UNDER THE PREEXISTING STANDARDS

Petitioners first argue that MSHA failed to make the necessary threshold finding of significant risk under the preexisting standards, and that, therefore, the Final Rule was not issued in accordance with applicable law, as required by the APA.  5 U.S.C. § 706(2)(A); see, e.g., Nat'l Mining Ass'n v. Sec'y of Labor, 153 F.3d 1264, 1269 (11th Cir. 1998) (vacating an MSHA rule because the Agency did not make the required finding of feasibility necessary to promulgate the rule).  The Mine Act authorizes the Secretary to "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines."  30 U.S.C. § 811(a). Petitioners specifically argue that the Mine Act's language requires a threshold

---

[3]    Before oral argument, we granted the motion for leave to intervene on the side of the Department of Labor and MSHA by the United Mine Workers of America International Union and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC.

finding that a current standard presents a "significant risk" to miners that will be eliminated or lessened by the new standard.

Petitioners analogize the Mine Act to the Occupational Safety and Health Act of 1970 ("OSH Act"), 29 U.S.C. § 651 et seq.  The OSH Act authorizes promulgation of "occupational safety and health standards," which it defines as "a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment."  29 U.S.C. §§ 652(8), 655(b) (emphasis added).  In Industrial Union Department, AFL-CIO v. American Petroleum Institute, commonly referred to as the Benzene case, the Supreme Court interpreted this language as requiring the Secretary to "make a threshold finding that a place of employment is unsafe—in the sense that significant risks are present and can be eliminated or lessened by a change in practices."  448 U.S. 607, 642, 100 S. Ct. 2844, 2864 (1980) (plurality opinion).

Petitioners contend that the Mine Act ought to be interpreted in the same way, arguing that the Act imposes a requirement on MSHA to find (1) that "significant risks" are present under existing rules and (2) that new standards are necessary to eliminate those risks.  Neither of these requirements have been met, say petitioners.  They argue that because the mining industry is perhaps the safest it has ever been, and because MSHA has not shown that the dangers still present in

7

mining are associated with the 1979 examination standards, MSHA cannot show that its changes to those standards will eliminate any existing risks.

We do not agree that the Mine Act imposes a requirement that MSHA makes a threshold finding that such a "significant risk" exists before regulating a particular aspect of mine operations. A review of the Supreme Court's decision in the Benzene case is instructive. There, the Court reviewed the OSH Act's requirement that Occupational Safety and Health Administration ("OSHA")-promulgated standards be "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8) (emphasis added). OSHA had promulgated a standard designating the maximum exposure limit to the toxic substance benzene. The previous standard had been 10 parts per million. Construing its mandate as authorizing standards to produce a virtually risk-free workplace to the extent possible, OSHA proposed a rule reducing the maximum exposure limit to 1 part per million. The Court held that, while OSHA's 10 parts per million limit was amply justified, there was little direct support for the reduction from 10 to 1 part per million. 448 U.S. at 631-34, 100 S. Ct. at 2859-60.

The Court concluded that before regulating a toxic substance, OSHA was required to determine that that substance posed a "significant risk" to employees under the OSH Act's standard. The Court derived its requirement of a threshold finding of "significant risk" from the term "safe," which it reasoned did not mean

8

"risk-free." Id. at 642, 100 S. Ct. at 2864. Plenty of activities, the Court stated, entail some risk of accident or material health impairment—driving a car, breathing city air, etc.—but we would not linguistically deem these activities "unsafe." Therefore, a workplace cannot be considered "unsafe" unless it "threatens the workers with a significant risk of harm." Id.

In addition to its primary focus on rejecting OSHA's understanding of the statute as authorizing the agency to promulgate standards to create a risk-free workplace, the Court also found support for a requirement of such threshold finding in the combination of the government's concession that a cost-benefit analysis was required and the explicit provisions of the OSH Act "requiring the elimination of the most serious hazards first." Id. at 644, 100 S. Ct. at 2865. "If such an analysis must precede the promulgation of any standard, it seems manifest that Congress intended, at a bare minimum, that the Secretary find a significant risk of harm and therefore a probability of significant benefits before establishing a new standard." Id.

For several reasons, we reject petitioners' invitation to import into the Mine Act the OSH Act's requirement of a threshold finding of significant risk. First, the two statutes have different language: the Mine Act is concerned with the "protection of life and prevention of injuries," and not merely "safe" workplaces. Petitioners argue that the phrase "protection of life and prevention of injuries" is

9

the functional equivalent of the word "safe." We disagree. Congress knows how to employ the word "safe" in a regulatory statute; the fact that it did not use the word in the Mine Act suggests it intended some materially different standard. And "protection of life and prevention of injuries" is both stronger and more specific than "safe." One could reasonably say that a hypothetical situation entails a small enough risk of harm that one could not deem a workplace "unsafe," but still would pose some risk of injuries that could be appropriately lessened with an improved standard that would impose little or no burden on industry.

Petitioners contend that the two statutes have similar language because both contain the word "appropriate." But the focus of the Benzene opinion was not on the meaning of "appropriate." Rather, the focus was on its determination that the statutory phrase—"reasonably necessary or appropriate to provide safe or healthful . . . places of employment"—did not mean risk-free workplaces. The Court held:

> But "safe" is not the equivalent of "risk-free." There are many activities that we engage in every day—such as driving a car or even breathing city air—that entail some risk of accident or material health impairment; nevertheless, few people would consider these activities "unsafe." Similarly, a workplace can hardly be considered "unsafe" unless it threatens the workers with a significant risk of harm.

10

448 U.S. at 642, 100 S. Ct. at 2864.  We also think the word "appropriate" is too capacious to justify importing into the Mine Act the OSH Act's requirement of a threshold finding of a significant safety risk.[4]

Second, there is no indication that the Mine Act itself requires MSHA to conduct a cost-benefit analysis before promulgating a regulation.  As the D.C. Circuit has noted, the Mine Act requires that regulations be "appropriate," and this requirement does not require a full cost-benefit analysis.  See Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin., 476 F.3d 946, 960-61 (D.C. Cir. 2007).  Moreover, there is no provision of the Mine Act requiring MSHA to establish priorities to ensure that the most serious hazards are addressed first.  It was that provision, more than the ordinary cost-benefit analysis, on which the Benzene Court relied in finding some support for its inference that a finding of significant risk was required before the agency established a new standard.  See Benzene, 448 U.S. at 644 & n.49, 100 S. Ct. at 2865 & n.49.  This is yet another difference between the Mine Act and the OSH Act as discussed in the Benzene case.

Significantly, the context of this case is far different from the Benzene case. There, the agency was proposing a new standard that attempted to create as near a

---

[4]    In any event, the MSHA findings in the Final Rule amply indicate that the new requirements in the Final Rule are "appropriate."

risk-free workplace as was "economically and technologically feasible."  448 U.S. at

655, 100 S. Ct. at 2870; see also id. at 637, 100 S. Ct. at 2861.  By contrast, the

Agency here is not attempting to create risk-free mines, but has instead proposed

modest changes to preexisting standards: requiring examinations to begin before

work, thus preventing miners from beginning shifts in hazardous workplaces;

requiring notice of hazards to miners, thus facilitating their avoidance of danger

until corrective action is taken; and enhancing recording requirements to improve

operator compliance.

The context of the workplaces affected by the Mine Act is also very different

from the workplaces affected by the OSH Act.  The Benzene opinion emphasized

the fact that the OSH Act had a pervasive impact on workplaces all across

American industry, whereas the Mine Act affects only workplaces in coal and

other mines, which Congress recognized as being especially vulnerable to safety

and health risks.  And there is some evidence in the statute that Congress has made

a legislative judgment that mines are inherently unsafe.  The statute states that

"there is an urgent need to provide more effective means and measures for

improving the working conditions and practices in the Nation's coal or other mines

in order to prevent death and serious physical harm," 30 U.S.C. § 801(c), while

§ 801(d) notes that "the existence of unsafe and unhealthful conditions and

practices in the Nation's coal or other mines is a serious impediment to the future

12

growth of the coal or other mining industry and cannot be tolerated." Of course,

these congressional findings were made in 1977, and conditions in our nation's

mines have assuredly changed, as petitioners note. But they are indicative of

Congress' belief that mines are by their nature very dangerous.[5] This conclusion is

in accord with our previous conclusion that "the Mine Act evinces a clear bias in

favor of miner health and safety." Nat'l Mining Ass'n v. Sec'y, U.S. Dep't of

Labor, 812 F.3d 843, 866 (11th Cir. 2016).

We also think it notable that the statute expressly authorizes the Agency to

"revise as may be appropriate, improved mandatory health or safety standards." 30

U.S.C. § 811(a) (emphasis added). This indicates a congressional contemplation of

periodic revisions to improve safety in mines, which Congress clearly thought

particularly vulnerable to safety risks, as the congressional findings discussed

above show.

Importantly, MSHA cites no case—in this or any court of appeals—holding

that the Mine Act has the same threshold finding requirement as the OSH Act.

Were we to hold that the Act contains a "significant risk" requirement, therefore,

we would be the first since the Act's enactment, and would substantially alter the

---

[5]     Hence Congress' cordoning off of its mine safety regulation into a separate statute. As the Department of Labor noted at oral argument, the Mine Act regulates the nation's above-and below-ground metal and nonmetal mines. The OSH Act regulates, essentially, all other workplaces.

courts' review of MSHA's promulgations.  Such a holding would also run counter

to the D.C. Circuit's conclusion that the Mine Act "[a]rguably . . . does not

mandate the same risk-finding requirement as OSHA."  Nat'l Mining Ass'n v.

Mine Safety & Health Admin., 116 F.3d 520, 527 (D.C. Cir. 1997).

We therefore hold that the Mine Act does not contain the "significant risk"

threshold requirement that petitioners would import from the OSH Act.

### III.    PETITIONERS' ARGUMENT THAT MSHA FAILED TO DEMONSTRATE THAT THE FINAL RULE CONSTITUTES AN IMPROVEMENT OVER THE PREEXISTING STANDARD

Petitioners also contend that MSHA failed to make the requisite showing

that the new standard constitutes an improvement over the existing 1979

standards.[6]  A review of the Final Rule indicates that this argument is wholly

without merit.  The Agency has made explicit findings that the several new

requirements constitute improvements.  After careful review, we readily conclude

that its findings are sufficient.  The new requirements plainly improve on the 1979

standards with respect to each new requirement that petitioners challenge:  (1) the

new pre-shift inspection requirement plainly avoids risks of miners' exposure to

hazards not discovered until later in the shift under the prior rule where the

inspection could occur any time during the shift; (2) the new requirement that

---

[6]    The parties agree that this requirement is present in the statute.

14

miners be notified promptly of any such hazard obviously avoids risks to miners, enabling them to take protective measures to avoid the risk; and (3) the new recordkeeping requirement will facilitate prompt remedial action, monitoring and follow-up by management, and incentivize prompt remedial action.

With respect to the new pre-shift inspection requirement and the new requirement of prompt notification to affected miners, the Final Rule included, inter alia, the following findings. The Final Rule notes that examinations under the 1979 standards "are not always done at a point during the shift when the results of the examination would provide the necessary protections," and concludes that the pre-shift examination requirement helps prevent miners from being "exposed to conditions that may adversely affect their safety and health." 82 Fed. Reg. at 7689. The Final Rule, MSHA stated, would "reduce the variability in how operators conduct examinations of working places and thereby improve miners' safety and health." Id. The requirement that miners in the affected area be notified promptly of adverse conditions enables them to "take protective measures or avoid the adverse conditions altogether." Id. at 7684-85; see also id. at 7686 (noting that notification lets miners "take the necessary precautions to avoid an accident or injury"). We conclude that these new requirements do constitute improvements over the preexisting standards, and that the Agency's findings are sufficient. Just as the 2018 Amendment, "[o]n its face . . . increase[d] miners' exposure to health

15

and safety risks" by rolling back the Final Rule's pre-shift examination requirement, United Steel, 925 F.3d at 1283, so too does the Final Rule decrease that exposure by mandating that examinations occur before work begins. Thus, MSHA properly found that the pre-shift inspection requirement and the prompt notification requirement would improve miners' safety and health. 82 Fed. Reg. at 7689. We conclude that those findings are amply supported.

The new recording requirements provide that examination records include names, dates, and descriptions of the location and adverse condition.[7] These requirements would serve a number of functions, including making clarification or follow up easier, identifying trends in mine conditions, and ensuring that mine operators are aware of all locations that have been examined. Id. at 7686. The recordkeeping requirement will also incentivize mine operators to become more "proactive" in remedying hazardous conditions. Id. at 7681, 7686, 7689. The notification requirement and the more fleshed-out recording requirements would work together to "result in more effective and consistent workplace examinations and ensure that adverse conditions will be timely identified, communicated to miners, and corrected." Id. at 7689. These agency findings are adequately

---

[7]    These requirements are not onerous. Obviously, the name and date requirements are not. With respect to the requirement that the record contain a description of the location and adverse condition, the Final Rule expressly allows the use of checklists or any other formats and, with respect to the description of adverse condition, the Final Rule requires only sufficient information to allow the mine operator to notify the miners and take prompt corrective action. Id. at 7686.

16

supported and demonstrate that the Final Rule's revisions to the 1979 standards constitute improvements.[8]

Petitioners emphasize the Final Rule's statement that the Agency is "unable to separate the benefits of the new requirements under the final rule from those benefits attributable to conducting a workplace examination under the existing standard." 82 Fed. Reg. at 7689. Read in isolation, this language could suggest some support for petitioners' argument that if mine operators merely complied more rigorously with respect to the examinations under the 1979 standards, they could achieve all of the safety benefits of the Final Rule. But read in context, it is clear that MSHA is simply acknowledging that exact cost-benefit analysis in this area is difficult, and that it is unable to precisely quantify the benefits of the new standard. Earlier in the Final Rule, MSHA did make the explicit finding that the Rule would lead to benefits. Id. at 7682.

---

[8]     We also note that there is a separate source of statutory authority for the Final Rule's recordkeeping requirements. 30 U.S.C. § 813(h) provides that "every operator of a coal or other mine shall establish and maintain such records, make such reports, and provide such information, as the Secretary . . . may reasonably require from time to time to enable him to perform his functions under this chapter." This is a clear grant of statutory authority to set the parameters and requirements of mine operators' records, subject only to the mandate that the requirements be "reasonabl[e]." The Final Rule easily satisfies this reasonableness standard; as discussed above, the Rule explains why the new recordkeeping requirements are not onerous, see 82 Fed. Reg. at 7690-91, require important information for mine regulators, and will incentivize mine operators to be more proactive in fixing adverse conditions.

We agree with MSHA that the combined effect of the requirements "will improve miners' safety and health."  Id. at 7689.  We therefore hold that the Final Rule here satisfies the requirement that any rule "improve" upon the prior standard.

## IV. PETITIONERS' ARGUMENT THAT THE FINAL RULE IS ARBITRARY AND CAPRICIOUS

Petitioners next argue that the Final Rule is arbitrary and capricious.  See 5 U.S.C. § 706(2)(A).  To survive arbitrary and capricious review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Nat'l Min. Ass'n, 812 F.3d at 865 (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2866 (1983)).  Courts must uphold rules that are "rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute."  Id. (quoting State Farm, 463 U.S. at 42, 103 S. Ct. at 2866). "The scope of review . . . is narrow and a court is not to substitute its judgment for that of the agency."  Id. (quoting State Farm, 463 U.S. at 43, 103 S. Ct. at 2866). Arbitrary and capricious review is "highly deferential and presumes the validity of agency action," its goal being to ensure that MSHA engaged in reasoned decisionmaking.  United Steel, 925 F.3d at 1283.

Petitioners argue that three aspects of the Final Rule are arbitrary and capricious.  We address each in turn.

18

A.  Petitioners' Argument that the New Examination Requirement is Arbitrary and Capricious

First, petitioners claim that the examination requirement is arbitrary and capricious.  This aspect of the Final Rule alters the 1979 standards by directing that the mandatory once-per-shift working place inspection or examination occur before miners begin to work in a given area.  Petitioners argue that there is no evidence in the administrative record that examinations were occurring too late to protect miners from adverse conditions, and that most of the evidence cited by MSHA to justify this rule involved adverse conditions that existed for extended periods of time, such that they should have been detected under the 1979 standards.[9]

MSHA responds by noting that the Final Rule states that "[i]n the Agency's experience, despite MSHA guidance and best practices, under the existing standard working place examinations are not always done at a point during the shift when the results of the examination would provide the necessary protections as intended

---

[9]    Petitioners also argue that MSHA's rationale for promulgating the Final Rule lacks a rational connection to its asserted basis because MSHA erroneously relied on 16 accidents that resulted in fatalities.  In at least 12 of these accidents, MSHA contends, the operator of the mine already had knowledge of the hazardous condition that led to the fatality.  They therefore could not have lacked knowledge because of a deficiency in the existing rule.  This argument reads the Final Rule too narrowly and thus misunderstands its purpose.  The Rule is not only concerned with alerting operators of adverse conditions.  Knowledge of adverse conditions is entirely pointless if mine operators do not act on that knowledge.  And the Final Rule is designed to incentivize mine operators to fix adverse conditions promptly, both by informing miners of those conditions and by creating a contemporaneous record of them.  MSHA thus expects that the revised rules will incentivize remedial action by operators with knowledge of adverse conditions.

19

by the Mine Act and the existing standard." 82 Fed. Reg. at 7689. The Agency also noted that in its experience, "there is a significant degree of variability in how safety programs are operationalized," and that reducing this variability will improve miner safety. Id.; see also id. at 7692.

We think that this is a permissible factual basis for a rule that, upon review, is not particularly burdensome on mine operators. Agencies are permitted to rely on their experience in the regulated field, so long as they explain what their experience is and how that experience informs the agency's conclusion. For example, in National Mining Ass'n v. Mine Safety & Health Administration, 116 F.3d 520, 546-47 (D.C. Cir. 1997), the Secretary cited his "experience" in support of a rule eliminating a superintendent's signature requirement on pre-shift examinations; the Secretary noted that, in MSHA's experience, mine superintendents were not intimately familiar with the working places being examined in the mines, and so eliminating the need for their signatures on examination records would not lead to a decrease in safety. Courts have not permitted agencies to rely on their "experience" only when the agency fails to actually explain what that experience was and how that experience supports the promulgated regulation. See Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 626 F.3d 84, 94 (D.C. Cir. 2010).

20

We think MSHA adequately supported its citation to its experience.  MSHA concluded that mine operators were often conducting their mandatory examinations after shifts had begun.  This trend was problematic, given that it would naturally mean miners are beginning work in an area that may contain hazardous conditions.  As noted at one of the hearings MSHA held during the rulemaking process, one could analogize the situation to climbing a ladder: climbers check the stability of their ladders before they begin climbing, not halfway up.  Of course, the administrative record would have been stronger had there been citations to specific instances of miner safety being impaired by examinations occurring too late in a shift.  But such painstaking factual support was not necessary in National Mining Ass'n, 116 F.3d at 527, and MSHA's factual findings based on its experience here are similar to its findings in that case.[10]

Moreover, the Agency's experience noted above was not the full extent of MSHA's reasoned explanation for requiring the shift inspection before the shift begins.  MSHA also relied upon the need to "notify miners in affected areas of any conditions found that may adversely affect their safety or health."  82 Fed. Reg. at 7689.  Only a pre-shift inspection can provide the basis for notifying miners of any

_____

[10]    We also acknowledge difficulty in understanding petitioners' challenge to MSHA's reliance on its experience that the shift inspections under the preexisting law were often conducted after the shift had begun.  If that experience were not accurate, then the new requirement effects no change, and petitioners' argument is therefore moot.  Only if the Agency's experience is accurate is there a new requirement, as a practical matter, which might be subject to an arguable challenge by the petitioners.

21

adverse condition "so that miners can take the necessary precautions to avoid an accident or injury." Id. at 7686.

For these reasons, we conclude that the pre-shift examination requirement is not arbitrary and capricious.[11]

### B. Petitioners' Argument that the New Notification Requirement is Arbitrary and Capricious

Petitioners next challenge the notification requirement, which mandates that mine operators notify miners of adverse conditions in their work areas. Petitioners claim that MSHA does not provide any instances where miners were not notified of adverse conditions and therefore suffered harm. Petitioners also cite to

---

[11] Notwithstanding the suggestion within the dissent, we note that we have recognized and cited the "more recent[]" D.C. Circuit decision—International Union, United Mine Workers of America v. Mine Safety & Health Administration, 626 F.3d 84 (D.C. Cir. 2010)—upon which the dissent relies. Indeed, we have attempted to apply its standard—i.e., ensuring that MSHA explained "what the '[a]gency experience' was and how it informed the determination." Id. at 94 (quoting Nat'l Mining Ass'n, 116 F.3d at 546–47). But we clarify. The "what" was its experience that the examinations were not always being conducted at a time to provide the necessary protections. The "how" was that conducting the examination before the shift and notifying miners of any hazards would enable miners to take the necessary precautions to avoid an accident or an injury. Moreover, as noted in Parts IV.A and B, the Agency's experience was not the full extent of MSHA's reasoned explanation. The Agency repeatedly emphasized the obvious fact that only an examination and notice to miners before work begins could alert miners to hazards so they can take protective measures. 82 Fed. Reg. at 7682 et seq. We readily conclude that the record adequately supports the requirements for an examination before work begins and notice to miners—especially in light of the fact that the Agency's reasoned explanations for these requirements are so firmly rooted in common sense and common experience. See, e.g., Gen. Instrument Corp. v. FCC, 213 F.3d 724, 734–35 (D.C. Cir. 2000) (holding Federal Communications Commission order treating differently certain cable box devices was not arbitrary and capricious because "[w]hile the Commission's order [wa]s hardly a model of comprehensiveness on this point," the record included a supporting argument from a coalition of retailers in the industry and "the Commission's concern" prompting the order "appear[ed] well-grounded in common sense").

comments made during the rulemaking process arguing that the existing 1979 standards already required prompt action to remedy adverse conditions, eliminating the need for notification to miners of those conditions.

MSHA responds that the administrative record supports this notification requirement.  The Final Rule cites 16 fatal accidents; 12 of these are conceded by petitioners as involving adverse conditions that mine operators knew of but failed to correct.  MSHA contends that it is obvious that, if miners had been notified of these conditions, they would be able to take their own precautions.

We conclude that the Final Rule amply supports the notification requirement.  The Rule specifically states that "[m]iners need to know about adverse conditions in their working place so that they can take protective measures or avoid the adverse conditions altogether."  82 Fed. Reg. at 7684-85.  The Notice of Proposed Rulemaking supports this conclusion with a discussion of three particular fatal accidents in which miners were not warned or notified of the adverse conditions that caused the fatalities.

Moreover, petitioners place unwarranted reliance on comments during the rulemaking process arguing that the existing standards require prompt action to remedy adverse conditions, thus eliminating the need for notification of those conditions.  The Final Rule "recognizes that if adverse conditions are corrected

23

before miners begin work, notification is not required because there are no 'affected areas.'" Id. at 7685.

Petitioners concede that in 12 of the 16 fatal accidents cited by MSHA in support of the Final Rule, the mine operators knew of but did not correct the condition. Notifying the miners would, of course, enable them to take their own precautions. Id. at 7684-85, 7686, 7689. And it would also provide an incentive for the operator to be more proactive about correcting hazards. In other words, an operator, knowing that the miners are aware of both the hazard and the operator's failure to correct them, will have an additional incentive to correct the problem promptly.

We conclude that there is ample support for the Agency's findings, and that the notification requirement is not arbitrary or capricious.

C. Petitioners' Argument that the New Recording Requirements are Arbitrary and Capricious

Finally, petitioners challenge the expanded requirements for examination records. The Final Rule requires operators to record the name of the person conducting the examination, the date of the examination, a description of the adverse conditions, and the date of any corrective actions taken. MSHA justifies the rule by arguing that in the 16 fatal accidents discussed in the administrative record, if this information had been promptly recorded, the records may have

24

alerted mine operators to take prompt corrective action.[12]  This is insufficient, say

petitioners; they argue that there is no evidence that recording names and dates

would bring any safety benefits, and, moreover, the 16 fatalities involved operators

who already had knowledge of the adverse conditions, so recording those

conditions would have been fruitless.

MSHA responds that more stringent recording requirements would lead to

adverse conditions being corrected more often.  A more rigorous recording

requirement incentivizes prompt corrective action, and noting who recorded the

condition, and when they did so, incentivizes individual compliance.

We think the recording requirement is abundantly justified by the Final

Rule.  The requirement that the examiner's name be included adds no substantive

duties whatsoever.  MSHA found that the examiner's identity is important in case

the condition needs to be clarified, or if follow-up is necessary or appropriate.  82

---

[12]    The dissent discounts MSHA's reliance on its experience based in part on its study of accident investigation reports from January 2010 through mid-December 2015, including the 16 fatal accidents, because, the dissent says, the Agency did not reference any of those accidents in the Rule's section-by-section analysis.  We respectfully disagree.  In the background section of the Final Rule, MSHA expressly referenced its study of these accident reports and expressly concluded:  "MSHA believes that for these 16 accidents, had the person making the examination recorded these adverse conditions, the records may have alerted operators to take prompt corrective action thus preventing the accidents."  82 Fed. Reg. at 7682.  We doubt that such express reference need be repeated in the section-by-section analysis.  In any event, in the section-by-section analysis relating to records, MSHA expressly invoked the very conclusion it derives from its accident history study.  See id. at 7686 ("MSHA believes that, by making a record of adverse conditions, mine operators and miners will become more proactive in their approach to correcting the conditions and avoiding recurrence, thereby improving protections for miners.  The Agency believes that a record that notes the adverse conditions prior to miners working in an area expedites the correction of these conditions.").

Fed. Reg. at 7686.  The date requirement is justified because dating the record is important both for record management and for identifying trends in mine conditions.  Id.  The requirement that operators record the locations that have been examined is justified as ensuring that operators are aware that all locations in the working place have been examined.  Id.

More generally, the enhanced recordkeeping requirements will lead to more proactive mine operators.  Id. at 7681, 7686, 7689.  If conditions are not recorded, they "may exist for more than one shift, causing or contributing to an accident, injury, or fatality."  Id. at 7687.  A record will expedite correction and can be used to identify trends.  If mine operators are required to include more detail about conditions identified during examinations, and are required to include their names alongside that detail, they will naturally be more incentivized to correct those conditions, in case management or MSHA representatives come inspecting.[13]

We reject petitioners' argument that the 16 accidents referenced by MSHA do not support the enhanced recordkeeping requirement.  In the "majority" of these accidents, petitioners argue, "the operator already had knowledge of the [adverse] condition."  Even if this is true, we do not see how it renders the requirements arbitrary and capricious.  When conditions are recorded, others on site could learn

---

[13]    We do not understand petitioners' argument that this "proactive mine operator" justification is not in the administrative record and is therefore a post hoc rationalization; it appears in the Final Rule multiple times.  82 Fed. Reg. at 7681, 7686, 7689.

26

about those conditions.  And the more persons on site who are aware of an adverse condition (or could become aware), the likelier it is that the condition will be dealt with promptly.

We conclude that the Agency's findings are sufficient, and that the challenged recording requirements are not arbitrary and capricious.

D. <u>Cumulative Effect of the New Requirements</u>

While we have analyzed the three challenged aspects of the Final Rule individually, it is worth noting that MSHA clearly does not view these aspects as operating individually.  MSHA's main impetus for the Final Rule were 16 accidents resulting in 18 fatalities.  These fatalities, in MSHA's view, were caused by mine operators' failure to take prompt corrective action.  It is apparent from reading the administrative record that MSHA sees the examination requirement, the notification requirement, and the recordkeeping requirement as operating collectively to spur more timely corrections of hazardous conditions.  The pre-shift examination requirement forces operators to learn of hazards earlier than they might otherwise, and helps prevent miners from beginning work in dangerous areas.  The notification requirement then informs the miners of any hazards found before they began work, thus letting them tailor their work to those conditions or avoid working in dangerous areas entirely.  And the recordkeeping requirement ties everything together, creating a thorough documentation of what working

27

places were examined and by whom, when those examinations occurred, and what will be done about conditions found during those examinations. While each challenged aspect of the rule is amply justified when viewed in isolation, a holistic review of the Final Rule reveals that each aspect is really just one interlocking part of the overall improvement of the safety standard. We readily conclude that the new requirements of the Final Rule easily satisfy our arbitrary and capricious scope of review.

## V.  PETITIONERS' OTHER ARGUMENTS

Petitioners raise a handful of other arguments. We reject them all as wholly without merit. First, they contend that three terms in the Final Rule are unconstitutionally vague: (1) the term "adversely" in the phrase "conditions that may adversely affect safety or health"; (2) the term "working place," which the Final Rule's Preamble states now includes "roads traveled to and from a work area"; and (3) the term "affected area" in the phrase "promptly notify miners in any affected areas of any [adverse] conditions found." Petitioners appear to argue that these terms are so vague as to be prohibited by both the Fifth and Fourteenth Amendment's due process clauses.

We have no difficulty in rejecting this challenge. Petitioners have not demonstrated that the challenged terms and phrases are so "substantially incomprehensible" as to violate the Constitution. Exxon Corp. v. Busbee, 644 F.2d

28

1030, 1033 (5th Cir. Unit B May 1981) (for a regulatory provision not within First Amendment protection to be unconstitutionally vague, "it must be so vague and indefinite as really to be no rule or standard at all"; in other words, "it must be substantially incomprehensible" (internal quotations omitted)).[14]  Moreover, in this regulatory context the void for vagueness doctrine applies only rarely, and only if the challenged phrase is impermissibly vague in all of its applications.  Am. Iron & Steel v. Occupational Safety & Health Admin., 182 F.3d 1261, 1277 (11th Cir. 1999).  None of the challenged phrases ever approach that standard.  We thus reject petitioners' void-for-vagueness argument.[15]

Next, petitioners argue that the Final Rule violates Executive Orders 12,866 and 13,563, which direct agencies to conduct cost-benefit analyses of regulatory actions and alternatives to regulation, and to ensure that the regulations impose the "least burden on society, consistent with obtaining regulatory objectives." Petitioners argue that the cost-benefit analysis underlying the Final Rule is lacking,

---

[14]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[15]    Petitioners' initial brief refers in cursory manner to an argument that, because the challenged terms are grievously ambiguous, the Final Rule is rendered arbitrary and capricious. We do not think this argument is fairly raised; petitioners cite no case law supporting the claim that ambiguous provisions in a regulation can render that regulation arbitrary and capricious. "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681 (11th Cir. 2014).  While petitioners expand on this argument in their reply brief, "[t]hose arguments come too late," and we do not consider arguments fairly raised for the first time in reply briefs.  Id. at 682-83.

29

and fails to satisfy the standards set forth in the Executive Orders.  In particular, petitioners contend that MSHA's estimation of the costs resulting from the rule are unrealistic, underestimate the number of persons required to conduct regular workplace examinations, underestimate the time burdens resulting from the new recording requirements, and fail to account for training, updated procedures, new documentation, storage systems, and lost work hours.

But in order to bring this challenge, petitioners must demonstrate that the APA permits judicial review of agency action that violates these two Executive Orders.  They have not made this demonstration, and appear merely to assume in their principal brief that judicial review exists.  Other circuits have held that there is judicial review of agency action that purportedly conflicts with an executive order only when (1) the Executive Order has a "specific statutory foundation," (2) the statute and the Executive Order do not preclude judicial review, and (3) there is an objective standard by which the court can judge the agency's actions.  See City of Albuquerque v. U.S. Dep't of Interior, 379 F.3d 901, 913 (10th Cir. 2004); City of Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1166 (9th Cir. 1997).

We conclude that neither Executive Order at issue here permits judicial review of inconsistent agency action.  Both Executive Orders state that they do not "create any right or benefit, substantive or procedural, enforceable by any party"

30

against agencies.  See Exec. Order No. 13,563 § 7(d), 76 Fed. Reg. 3821, 3823 (Jan. 18, 2011), reprinted as amended in 5 U.S.C. § 601 at 101-02; Exec. Order No. 12,866 § 10, 58 Fed. Reg. 51,735, 51,744 (Sept. 30, 1993), reprinted as amended in 5 U.S.C. § 601 at 86-91.  And at least one other circuit has held that Executive Order 12,866 creates no private rights and an agency's failure to comply with it is not subject to judicial review.  See Helicopter Ass'n Int'l, Inc. v. FAA, 722 F.3d 430, 439 (D.C. Cir. 2013); see also Meyer v. Bush, 981 F.2d 1288, 1296 n.8 (D.C. Cir. 1993) ("An Executive Order devoted solely to the internal management of the executive branch—and one which does not create any private rights—is not, for instance, subject to judicial review.").  We thus hold that we cannot review whether the Final Rule is inconsistent with either Executive Order.[16]

## VI.  CONCLUSION

The Mine Act does not impose a stringent "significant risk" requirement, as petitioners contend.  The Final Rule's impact on miner safety plainly improves on

---

[16]    Petitioners make passing reference to an argument that the Final Rule is not economically feasible and an argument that the Agency's cost-benefit analysis was arbitrary and capricious. But petitioners do not support these arguments with sufficient detail; their contention is conclusory and unsupported by citations to authority or significant discussion.  We consider these arguments abandoned and do not consider them.  See supra note 15.

Petitioners also argue that MSHA improperly failed to comply with the Regulatory Flexibility Act as amended by the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. § 601.  While petitioners included this contention in their statement of issues, they raise it only in a footnote in a perfunctory and conclusory manner.  We do not consider arguments raised only in such manner.  SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786, 811-12 (11th Cir. 2015).  So we will not consider petitioners' Regulatory Flexibility Act argument.

31

the 1979 standards.  The Final Rule is not arbitrary and capricious.  And we reject petitioners' other challenges.  Accordingly, we deny the petition for review.

**PETITION DENIED.**

LAGOA, Circuit Judge, dissenting:

In this petition for review, Petitioners National Mining Association, National Stone, Sand & Gravel Association, Portland Cement Association, American Iron & Steel Institute, Georgia Mining Association, and Georgia Construction Aggregate Association (collectively, "Petitioners") challenge the final rule entitled "Examinations of Working Places in Metal and Nonmetal Mines" ("Final Rule") promulgated by the United States Secretary of Labor ("Secretary") and the Mine Safety and Health Administration ("MSHA").  82 Fed. Reg. 7680–95 (Jan. 23, 2017) (to be codified at 30 C.F.R. §§ 56.18002, 57.18002).  I respectfully disagree with the majority's conclusion that the promulgation of the Final Rule was not arbitrary and capricious.  In my view, MSHA has failed to articulate a satisfactory explanation for the Final Rule by not establishing a rational connection between the facts found in the rulemaking record and the new working place examination standards it promulgated.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto*

32

*Ins. Co.*, 463 U.S. 29, 42–43 (1983).  Rather, MSHA's offered explanation for the standards in the Final Rule "runs counter to the evidence before the agency."  *See id.* at 43.  For the reasons stated below, I would therefore find that the Final Rule was arbitrary and capricious and vacate the Final Rule without addressing the other arguments presented to us.

## I.    RELEVANT FACTUAL AND PROCEDURAL HISTORY

Under the Federal Mine Safety and Health Act of 1977 (the "Mine Act"), § 101(a), 30 U.S.C. § 811(a), the Secretary is directed to, by rule, "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines." On August 17, 1979, "MSHA revised, renumbered, and made mandatory the Agency's advisory standards regarding working place examinations" of metal and nonmetal ("MNM") mines.  82 Fed. Reg. at 7681.  Of relevance here, the 1979 working place examination standards for MNM mines required: (1) "[a] competent person designated by the [mine] operator [to] examine each working place at least once each shift for conditions which may adversely affect safety or health;" (2) the operator to "promptly initiate appropriate action to correct such conditions;" and (3) the operator to keep records of "such examinations" for a period of one year and to make those records available for review by the Secretary.  30 C.F.R. §§ 56.18002,

57.18002 (2016).  "Working place" is defined as "any place in or about a mine where work is being performed."  30 C.F.R. §§ 56.2, 57.2 (2017).

On June 8, 2016, MSHA published a proposed rule titled "Examinations of Working Places in Metal and Nonmetal Mines" ("Proposed Rule").  81 Fed. Reg. 36818-01 (June 8, 2016).  Following publication of the Proposed Rule, MSHA received comments and held four public hearings on the Proposed Rule.  82 Fed. Reg. at 7681–82.  Then, on January 23, 2017, MSHA promulgated the Final Rule, amending the prior iteration of 30 C.F.R. §§ 56.18002 and 57.18002 (2016) to provide:

> (a) A competent person designated by the operator shall examine each working place at least once each shift before miners begin work in that place, for conditions that may adversely affect safety or health.
>
> > (1) The operator shall promptly notify miners in any affected areas of any conditions found that may adversely affect safety or health and promptly initiate appropriate action to correct such conditions.
> >
> > (2) Conditions noted by the person conducting the examination that may present an imminent danger shall be brought to the immediate attention of the operator who shall withdraw all persons from the area affected (except persons referred to in section 104(c) of the Federal Mine Safety and Health Act of 1977) until the danger is abated.
>
> (b) A record of each examination shall be made before the end of the shift for which the examination was conducted.  The record shall contain the name of the person conducting the examination; date of the

34

examination; location of all areas examined; and description of each condition found that may adversely affect the safety or health of miners.

(c) When a condition that may adversely affect safety or health is corrected, the examination record shall include, or be supplemented to include, the date of the corrective action.

(d) The operator shall maintain the examination records for at least one year, make the records available for inspection by authorized representatives of the Secretary and the representatives of miners, and provide these representatives a copy on request.

30 C.F.R §§ 56.18002, 57.18002 (2017).

In the Final Rule, MSHA stated that it had reviewed accident investigation reports from January 2010 through mid-December 2015 and that, during this period, 122 miners were killed in 110 accidents at MNM mines.  82 Fed. Reg. at 7682. MSHA explained that it had conducted investigations into each of those fatal accidents, "of which 16 accidents (18 fatalities) citations were issued to mine operators for unwarrantable failure to comply for purposes of Section 104(d) of the Mine Act,"[1] and it was the agency's belief that "had the person making the examination recorded these adverse conditions, the records may have alerted operators to take prompt corrective action thus preventing the accidents." *Id.*

---

[1] Section 104(d) of the Mine Act authorizes a representative of the Secretary to issue a citation where a violation of a mandatory health or safety standard "could significantly and substantially contribute to the cause and effect of a . . . mine safety or health hazard" and that violation is "caused by an unwarrantable failure of such operator to comply with such mandatory health or safety standards."  30 U.S.C. § 814(d)(1).

In changing the timing of working place examinations during a shift to be conducted "before miners begin work in that place," MSHA noted that the purpose of this requirement was "to ensure that for each shift the examinations occur at a time that is sufficiently close to when miners begin their work" in order to "minimize potential exposure to conditions that may adversely affect their safety or health," as "conditions at mines can change." *Id.* at 7683. In support of this new standard, MSHA stated that it was "the Agency's experience" that, under the existing standard, "working place examinations are not always done at a point during the shift when the results of the examination would provide the necessary protections as intended by the Mine Act and the existing standard." *Id.* at 7689. Regarding the new notification requirement, MSHA stated that "[m]iners need to know about adverse conditions in their working place so that they can take protective measures or avoid the adverse conditions altogether." *Id.* at 7684–85. As to the new examination recording requirements, MSHA stated it was its "experience" that "if adverse conditions are not recorded, these conditions may exist for more than one shift, causing or contributing to an accident, injury, or fatality." *Id.* at 7687. MSHA further noted it believed that "by making a record of adverse conditions, mine operators and miners will become more proactive in their approach to correcting the conditions and avoiding recurrence, thereby improving protections for miners." *Id.* at 7686. MSHA, however, did not discuss how the sixteen accidents it investigated

36

informed its decision to promulgate the new standards in the Final Rule nor reference any of those accidents in the rule's section-by-section analysis. *See id.* at 7682–88.

MSHA did include the investigation reports of the sixteen accidents referenced in the background of the Final Rule in the rulemaking record. However, a review of these reports does not suggest that any of the sixteen accidents occurred despite mine operators' compliance with the 1979 working place examination standards. Rather, the reports indicate that those accidents occurred where: (1) the mine operators or management were aware of the adverse conditions present and did not correct those conditions or otherwise comply with the existing 1979 working place examination standards; (2) the adverse conditions existed for multiple shifts; or (3) the operators failed to comply with separate regulations that required examination of ground conditions prior to commencing work in the area.[2]

## II.    ANALYSIS

Petitioners challenge the Final Rule on the basis that the new working place examination requirements are arbitrary and capricious. Specifically, Petitioners argue that MSHA's rationale for the new standards in the Final Rule lacks any rational connection to the evidence offered as the basis for the Final Rule, i.e., the

---

[2] *See* 30 C.F.R. § 56.3401 ("Appropriate supervisors or other designated persons shall examine and, where applicable, test ground conditions in areas where work is to be performed *prior to work commencing*, after blasting, and as ground conditions warrant during the work shift." (emphasis added)); *id.* § 57.3401 (same); *see also id.* § 56.9304(a) (requiring "[d]umping locations [to] be visually inspected *prior to work commencing* and as ground conditions warrant" (emphasis added)).

sixteen accidents.   Petitioners assert that for those sixteen accidents, the mine operators were already aware of the adverse conditions, the adverse conditions had existed for multiple shifts, or the adverse conditions at issue were governed by different regulations requiring examination of ground conditions before work began. Thus, according to Petitioners, those accidents demonstrate violations of the existing standards, not the need for the new standards promulgated by the Final Rule.

The Mine Act directs the Secretary to "by rule . . . develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines."   30 U.S.C. § 811(a).   This Court reviews a challenge to an agency's promulgated regulation under the Administrative Procedure Act, which requires us to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(a); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Ryder Truck Lines, Inc. v. United States*, 716 F.2d 1369, 1378 (11th Cir. 1983).   Under the arbitrary and capricious standard,

> a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute. . . . The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency.

*Nat'l Mining Ass'n v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 843, 865 (11th Cir. 2016) (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983)); *accord Miami–Dade County v. EPA*, 529 F.3d 1049, 1064–65 (11th Cir. 2008).

While this Court's review under the arbitrary and capricious standard is highly deferential, *see Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009), the deference afforded to an agency rule is not absolute. "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a '*rational connection between the facts found and the choice made*.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (emphasis added) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency rule is also arbitrary and capricious "if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* When reviewing the agency's explanation for its action, this Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285 (1974)). And, "[t]he reviewing court should not attempt itself to make up for . . . deficiencies" in the agency's explanation of its rule and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S.

194, 196 (1947)); *accord Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir. 2016).

After reviewing the Final Rule and the rulemaking record, I conclude that MSHA failed to provide a "rational connection between the facts found and the choice made" to promulgate the new working place examination standards. *Motor Vehicle Mfrs.*, 463 U.S. at 43 (quoting *Burlington*, 371 U.S. at 168). MSHA has not explained the basis for these new standards other than to refer and rely upon its own "experience" in a conclusory manner. Indeed, the accidents referred to by the Final Rule and contained in the rulemaking record do not support MSHA's conclusory statement of its "experience." Thus, these new standards in the Final Rule are arbitrary and capricious. I address each of the new standards in turn.

## A. Working Place Examination Timing Requirement

As to the new examination timing requirement, MSHA stated it was its "experience" that, "under the existing standard[,] working place examinations are not always done at a point during the shift when the results of the examination would provide the necessary protections intended by the Mine Act and the existing standard." 82 Fed. Reg. at 7689. Yet, the evidence offered by MSHA only demonstrates the failures of mine operators to comply with *existing* working place examination standards. Specifically, as detailed in the investigation reports, the mine operators or management in the sixteen accidents were (1) aware of the adverse

40

conditions that caused the accident but failed to correct the conditions; (2) aware that the adverse conditions existed for multiple shifts, demonstrating the mine operator's failure to conduct a working place examination at all; or (3) failed to comply with separate ground condition examination requirements. MSHA did not explain whether the new examination timing requirement would have prevented any of those accidents, and, similarly, there is no indication in any of the investigation reports that this new requirement would have done so. Therefore, there is no rational connection between MSHA's decision to require working examinations to occur before work starts at the beginning of a shift and the evidence offered by MSHA in the rulemaking record as the basis for the timing requirement.

In determining that the new examination timing requirement is not arbitrary and capricious, the majority points to MSHA's citation of its "experience" as the basis for promulgating the new standard, noting that "[a]gencies are permitted to rely on their experience in the regulated field, so long as they explain what their experience is and how that experience informs the agency's conclusion." Maj. Op. at 20. In support of this proposition, the majority relies upon the D.C. Circuit's decision in *National Mining Association v. Mine Safety and Health Administration*, 116 F.3d 520 (D.C. Cir. 1997). In that case, MSHA promulgated a set of safety rules that included eliminating the requirement of "second-level countersigning" by mine superintendents of certain examination reports, which a labor union challenged

41

under the "no-less protection rule" in section 101(a)(9) of the Mine Act. *See Nat'l Mining Ass'n*, 116 F. 3d at 525, 535–36, 544–546. In explaining the deletion of second-level countersigning rule, the Secretary stated in the rule's preamble that "[a]gency experience ha[d] demonstrated that higher level mine officials commonly lack hands-on involvement or in-depth knowledge of the specific conditions underground or how . . . ventilation rules impact[ed] upon those conditions" and that, thus, "countersigning by a mine official at a higher level does not assure *any* additional level of safety and imposes an unnecessary burden." *Id.* at 546–47 (emphasis in original) (quoting 61 Fed. Reg. 9764, 9767 (Mar. 11, 1996)). The D.C. Circuit found that the Secretary had provided a "reasoned explanation" for why the new rule would not cause a reduction in safety. *Id.* at 547. Notably, the D.C. Circuit's decision was silent as to whether MSHA's experience was supported by the rulemaking record in that case.

However, more recently in *International Union, United Mine Workers of America v. Mine Safety and Health Administration*, 626 F.3d 84 (D.C. Cir. 2010) ("*International Union*"), the D.C. Circuit found that MSHA could not rely on "its knowledge and experience" to justify a training provision where MSHA failed to explain "*what* the '[a]gency experience was and *how* it informed the determination." *Id.* at 93–94 (alteration and emphasis in original) (quoting *Nat'l Mining Ass'n*, 116 F.3d at 546–47). In *International Union*, MSHA promulgated a final rule "requiring

'hands-on' training only annually rather than quarterly." *Id.* at 86. The D.C. Circuit subsequently found the training requirement "arbitrary and capricious" because MSHA had not "explained the basis for [the new training requirement] other than to state it relied upon its 'knowledge and expertise.'" Id. at 87. The D.C. Circuit noted that MSHA had not identified what that knowledge and expertise was, had not pointed to studies or comparisons of types of training, and had not responded to—or, at most, had addressed in a conclusory manner—the commentators' objections about the training provision. *Id.* at 87, 93–94. The court further explained that MSHA was incorrect to rely on the *National Mining* decision "for the proposition that a rule may be supported solely by the agency's expertise," as *National Mining* did "not absolve MSHA from providing a reasoned explanation for its decision only to require annual hands-on training." *Id.* at 94. As the D.C. Court noted, unlike in *International Union*, the Secretary in *National Mining* "provided a 'reasoned explanation' by explaining "*what* the '[a]gency experience' was and *how* it informed the determination." *Id.* (alteration and emphasis in original) (quoting *Nat'l Mining Ass'n*, 116 F.3d at 546–47).

Similarly, this Court has explained that, when promulgating a policy shift due to changed circumstances, "an agency is entitled to rely to some extent on the experience and expertise it has acquired during the course of its existence, as long as this reliance on agency experience is documented and made a part of the record

43

so that the courts can determine whether the agency's action is facially rational." *Ryder Truck Lines*, 716 F.2d at 1385 (citations omitted).

Here, as in *International Union*, MSHA has provided no reasoned explanation for its decision. MSHA has not explained what its "experience" is beyond a conclusory statement in the Final Rule that working place examinations under the existing standards were not "always done at a point during the shift when the results of the examination would provide the necessary protections as intended by the Mine Act," nor has MSHA explained how that "experience" informed its determination. *See* 82 Fed. Reg. at 7689; *cf. Int'l Union*, 626 F.3d at 94. Additionally, the rulemaking record does not contain any evidence in support of this "experience." *See Ryder Truck Lines*, 716 F.2d at 1385. Rather, the investigation reports of the sixteen accidents demonstrate that mine operators and managers failed to comply with *existing* working place examination standards, not that accidents are occurring despite compliance with the existing standards.

The majority acknowledges the lack of record support for MSHA's "experience," stating that "the administrative record would have been stronger had there been citations to specific instances of miner safety being impaired by examinations occurring too late in a shift," but concludes that because "such painstaking factual support" was not necessary in the D.C. Circuit's *National Mining Association* decision, it is likewise not necessary in this case. Maj. Op. at 21.

44

However, the D.C. Circuit did not discuss the extent of the rulemaking record in determining that MSHA had given a reasoned explanation for its elimination of the "second-level countersigning" rule, *see Nat'l Mining Ass'n*, 116 F.3d at 545–47, and later clarified in *International Union* that an agency's conclusory reliance on "experience" in support of a rule alone was not a "reasoned explanation," *see* 626 F.3d at 93–94. And, even if such "factual support" was not required by the D.C. Circuit in *National Mining Association*, this Court's precedent in *Ryder Truck Lines* mandates an agency to document and include as part of the rulemaking record its experience when it relies on that experience for promulgating a rule or policy change. *See* 716 F.2d at 1385. MSHA did not do so here.

Moreover, requiring an agency to support its experience with factual documentation in the record should not be the "painstaking" task the majority suggests. Maj. Op. at 21. Indeed, if MSHA's experience is as it claims, then documentation of accidents that have occurred in MNM mines following a properly conducted working place examination on the same shift should be readily available for the agency to include in the rulemaking record. Such evidence would likewise demonstrate a rational connection to the choice MSHA made in promulgating this new standard. *See Motor Vehicle Mfrs.*, 463 U.S. at 43. Because such evidence is *not* in the rulemaking record, MSHA has failed to provide a reasoned explanation for the new timing requirement.

The majority also relies upon MSHA's "need to 'notify miners in affected areas of any conditions found that may adversely affect their safety or health'" in finding that MSHA has provided a "reasoned explanation" for the new timing requirement. Maj. Op. at 21 (quoting 82 Fed. Reg. at 7689). In doing so, the majority reasons that "[o]nly a pre-shift inspection can provide the basis for notifying miners of any adverse condition 'so that miners can take the necessary precautions to avoid an accident or injury.'" Maj. Op. at 21–22 (quoting 82 Fed. Reg. at 7686). MSHA makes a similar argument it its brief, arguing that "[t]he most effective time for the examination would be before miners begin working in order to protect miners against entering a work area without knowledge of any hazards there." MSHA, however, did not explicitly offer this reasoning—i.e., that the new timing requirement is the only way that miners can be notified of adverse conditions in their working places—as its justification for the new timing requirement in the Final Rule. And where Congress delegates a policy or judgment determination to an agency, this Court "may not accept appellate counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Mfrs.*, 463 U.S. at 50; *accord Chenery Corp.*, 332 U.S. at 196; *Int'l Union*, 626 F.3d at 94. As the Supreme Court has cautioned, a court reviewing agency action "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs.*, 463 U.S. at 43. Indeed, "[i]t is well-established that an agency's action must be upheld, if at all, on

46

the basis articulated by the agency itself." *Id.* at 50.  While this Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *see id.* at 43 (quoting *Bowman Transp.*, 419 U.S. at 286), I would not do so here where the choice made by MSHA lacks a rational connection to the evidence actually offered in the rulemaking record.  Instead, I would conclude that the new examination timing requirement in the Final Rule is arbitrary and capricious.

### B.  Miner Notification Requirement

Turning to the new notification requirement, MSHA explained its rationale for the rule as "[m]iners need to know about adverse conditions in their working place so that they can take protective measures or avoid the adverse conditions altogether."  82 Fed. Reg. at 7684–85.  Unlike the examination timing and recordkeeping requirements in the Final Rule, MSHA did not even cite to its own "experience" as a basis for promulgating the notification requirement.  And, in reviewing the reports of the accidents that MSHA cited to as the basis for promulgating the Final Rule, there is no indication of whether the miners were aware of the adverse conditions that ultimately caused the accidents.

In its discussion of the notification requirement, the majority points to the "Notice of Proposed Rulemaking" that discussed "three particular fatal accidents in which miners were not warned or notified of the adverse conditions that caused the fatalities."  Maj. Op. at 23.  While MSHA discussed these three accidents in the

47

background information section of its Proposed Rule, *see* 81 Fed. Reg. at 36,820, the agency dropped all reference to those three accidents in the Final Rule, *see* 82 Fed. Reg. at 7682, following commentary suggesting that those accidents did not support the new standards.[3]  Whatever its reasons, MSHA ultimately chose not to use those three specific accidents as its rationale for the Final Rule.

I also disagree with the majority's assertion that the notification requirement is amply supported.  MSHA offers a bare assertion in support of the notification requirement, i.e., that miners need to be notified about adverse conditions so that they can protect themselves.  *See* 82 Fed. Reg. at 7684–85.  But MSHA does not explain how any of the accidents, including the three accidents referenced by the Proposed Rule, in the rulemaking record—the evidence that MSHA offered in support of the Final Rule—informed its decision in promulgating the notification requirement, including whether any of those accidents might have been prevented with this new standard.  The majority offers an additional rationale for upholding the requirement that mine operators would be incentivized to correct adverse conditions promptly once the miners know of those conditions.  Maj. Op. at 24.  MSHA, however, did not offer this rationale as a basis for the notification requirement.  It is the duty of the agency to "articulate a satisfactory explanation for its action," and

---

[3] Indeed, reviewing the investigation reports of those three accidents, all seem to have occurred at least in part because mine operators failed to comply with existing standards.

this Court should not make up for deficiencies in MSHA's explanation. *Motor Vehicle Mfrs.*, 463 U.S. at 43. While the notification requirement might ultimately improve safety in MNM mines, MSHA has not met its burden in articulating a rational connection between the facts found and this new requirement. I therefore conclude that the notification requirement is also arbitrary and capricious.

## C. Examination Recordkeeping Requirements

Turning to the new recordkeeping requirements, MSHA stated that it was its belief that the recordkeeping requirements would result in mine operators and miners becoming "more proactive in their approach to correcting the [adverse] conditions" and "expedite[] the correction of these conditions." 82 Fed. Reg. at 7686. Additionally, MSHA stated that recording the identity of the examiner is "important" for the purposes of "clarifying the [adverse] condition noted or following up with the examiner regarding areas examined or conditions noted." *Id.* In support of the new recordkeeping requirements, MSHA stated that it was the agency's "experience" that "if adverse conditions are not recorded, these conditions may exist for more than one shift, causing or contributing to an accident, injury, or fatality." *Id.* at 7687. However, MSHA did not cite to any of the accidents in the rulemaking record as a basis for its experience. Indeed, there is no evidentiary support in the rulemaking record demonstrating that any of the sixteen accidents could have been prevented by any of the increased recordkeeping requirements. Rather, in many of

49

those accidents, the mine operator was already aware of the adverse condition present and had not corrected it, again showing a lack of compliance with the *existing* working place examination standards.    Thus, as with the examination timing requirements, MSHA has merely asserted its "experience" in a conclusory manner as the basis for the new recordkeeping requirements in the Final Rule.

As explained above, in my view, for MSHA to rely on its "experience" as a basis for promulgating a new standard, the agency was required to include evidentiary support in the rulemaking record documenting its "experience" in order to show a rational connection between the facts found in the rulemaking record and the choice made—here, the recordkeeping requirements.  *See Ryder Truck Lines*, 716 F.2d at 1385; *see also Motor Vehicle Mfrs.*, 463 U.S. at 43.  If it is, in fact, MSHA's experience that accidents are occurring due to inadequate recording of adverse conditions, then the agency should have evidence in support of that experience.  However, because MSHA did not put that supporting documentation in the rulemaking record, MSHA has not shown a rational connection between the facts found and the recordkeeping requirements.    As such, I conclude that the recordkeeping requirements are similarly arbitrary and capricious.

## D. The "Cumulative Effect of the New Requirements"

Finally, the majority concludes that under "a holistic review of the Final Rule," the standards therein are not arbitrary and capricious.  Maj. Op. at 27–28.

50

The majority recognizes that "MSHA's main impetus for the Final Rule were 16 accidents resulting in 18 fatalities," which, "in MSHA's view, were caused by mine operators' failure to take prompt corrective action." Maj. Op. at 27. However, even reviewing the requirements as operating collectively, as the majority suggests we should do, MSHA does not reference its "main impetus"—the sixteen accidents—in its explanation of the new standards. And, as explained above, a review of the investigation reports only reveals mine operators' failures to comply with the *existing* working place standards or other regulations concerning ground conditions. Even if each standard is "just one interlocking part of the overall improvement of the safety standard" and should be reviewed together, *see* Maj. Op. at 28, MSHA has not articulated a satisfactory explanation for the Final Rule based on the evidence the agency has offered in support of the new standards.

Based on the rulemaking record before this Court, MSHA's offered explanation for the standards in the Final Rule—its "experience"—runs counter to the evidence before the agency. *See Motor Vehicle Mfrs.*, 463 U.S. at 43. Indeed, the evidence in the record consists of accidents caused by mine operators failing to comply with the existing working place standards (e.g., by failing to correct known adverse conditions or by failing to conduct working place examinations at all for multiple shifts), not accidents occurring despite those operators' faithful compliance with the existing standards. If such accidents do exist, then MSHA should have

51

included them in the rulemaking record for this Court's review and offered some form of explanation as to how those accidents informed its decision. MSHA, however, did not include such accident reports in the record and thus has not provided any support for its experience-based rationale for the Final Rule. Furthermore, MSHA did not explain in the Final Rule how any of those accidents included in the record may have been prevented or mitigated by the new requirements. Without any such explanation, there is no rational connection between the evidence in the record (mine operators failing to correct known adverse conditions that lead to accidents) and MSHA's chosen action in addressing those accidents (new timing, notification, and recordkeeping requirements that, based on the rulemaking record and MSHA's lack of explanation, would not have prevented the referenced accidents). *Id.*

## III.  CONCLUSION

While this Court's review of agency action is highly deferential, that deference is not absolute. An agency cannot simply assert its "experience" in a conclusory manner as a basis for its action to satisfy arbitrary and capricious review. Instead, the agency must explain what that experience is, how that experience informed its decision, and should include documentation of that experience in the rulemaking record so that a reviewing court can determine if the action is facially rational. *See International Union*, 626 F.3d at 94; *Ryder Truck Lines*, 716 F.2d at

52

1385.  And, where an agency's action does not have a rational connection to the facts found, the agency's action is unlawful as arbitrary and capricious.

Here, MSHA failed to adequately explain or support, with documentation in the record, its experience and failed to show a rational connection between the facts found in the record and the standards it chose to promulgate in the Final Rule. Because I conclude the Final Rule promulgated by MSHA is arbitrary and capricious and should be vacated, I respectfully dissent.